I please the court. My name is Terry Merriam, and I represent the appellant taxpayers, the petitioners. Do you get to bill all of these clients a double hourly rate for each case? Yeah, that's a pretty good deal. Absolutely not. And at this time I'd like to reserve approximately seven minutes for rebuttal. We request that the court reverse the trial court regarding the finding that the statute regarding six years due to a fraudulent tax return be applied. We believe the judgment should be, well, first a housekeeping matter, if I may. There is a typographical error in the reply brief on page 20. The very last sentence. Call that to your attention. You might have actually noticed it, because the very last sentence reads, Thus, the partnerships themselves were shams. And instead, You should say not. That's correct, Your Honor. I heard a not. Did you? Thank you very much. We had a problem with the software that was involved. Once again, Or it could have been construed as a Freudian slip. I hope not. Once again, a little bit of background about this particular case. This particular case has been in front of this court before on a discovery dispute. There were also questions about whether or not Hoyt could sign statute extensions for 87, 88, and 89, and the case was revanded for additional discovery. And the tax court in the second case found that Hoyt couldn't sign, or the IRS couldn't rely on Hoyt signing those extensions, but then turned to 6629C and found that there was a six-year statute due to fraud. We note here that the government has the burden of proof on this issue, and the burden of proof is clear and convincing. And there are actually two aspects of the statute that are in dispute. One was that there was a false or fraudulent item, or that there was a concession about a false or fraudulent item on the returns, and two, that Hoyt signed with the intent to evade. And we want to be clear here. We do not believe the government met their burden of proof. Let me ask you a clarifying question. It was my impression that at least at the tax court level, you did not challenge any requirement other than fraudulent intent. No. I think that's a misunderstanding. The tax court found that there were false items. However, the stipulation referring to or the only stipulation about false items go specifically to the flock recap sheets, and there was a stipulation that they were false. However, there's no indication that they were used to prepare the tax returns. There's no evidence they were used to prepare the tax returns. There's evidence Hoyt testified in the River City Ranchers 4 case that they were reconstructed, and these flock recap sheets are also inconsistent with the returns. So that's, I think, the confusion, is that there is a stipulation about a false document, and the tax court, I think, is that. Let me just try to be clear. I understand that you are arguing to some extent that the stipulations weren't really stipulations but were sort of an avenue to, I don't know, do you still reserve some right to quibble with them? But my question was really more did you actually contest anything other than fraudulent intent in the tax court? Because the tax court said you didn't. Yes. All right. It's been a while, and I might check with my co-counsel, but yes. It was that there is no proof or evidence of any false item on the return, from the returns. There's no connection. Each year, it's a standard in the tax community that each year stands on its own, and that's particularly true in a fraud case, and the government needs to prove fraud in each year, 87, 88, and 89. That's perfectly true as a standard. But at the same time, when you're talking about a fraudulent scheme, why isn't it appropriate to look at a series of tax years and a series of consistently false or incorrect, let me put it that way, incorrect tax returns and infer from that that the incorrectness is actually attributable to fraud rather than to mistake? That can't stand on its own. You can look at a series or a pattern, and it's an element of fraud, but in this particular case, for example, there is almost a lack of any specificity per year. What happened in 1987? What happened in 1988? What happened in 1989? The government wants us to believe that everything was the same, so therefore what happened, for example, in 1994 also happened in 1997, but there's actually no evidence that that's true, and there is evidence that it's not true. For example, with the sheep count, Mr. Barnes went out and bought more sheep, so there was an increase of the number of sheep at some time. Or just fewer sheep that were missing rather than more or something. You know, Mr. Barnes — As long as it were accurate. That's all that matters, isn't it? Pardon? Isn't the only thing that matters that the sheep didn't exist? I mean, does it really matter how many didn't exist? See, we have to move — we were talking cattle before, and now we're talking sheep. I know. And the evidence in this particular case, Mr. Barnes, who was the sheep rancher, believed that there were sufficient sheep, and the evidence that he testified to is that he wasn't concerned about sheep until the very, very end. Okay. And is your position the same with respect to the fact that the sheep were valued somewhere in the $1,200 to $2,000 range, whereas an average award-winning sheep was worth $400? There's been no discussion on what Hoyt — and this goes to the intent to evade — but Hoyt believed the value of the warranties and the guarantees, the flock increase guarantees, what value those had. If Hoyt had actually — if Hoyt and Barnes had actually complied with those, those would have value. They didn't comply with them. They wouldn't have value separate from the sheep. And I don't want to go there, because that's been argued by Mr. Hoyt. But it would add some value, and we don't know what it is. The question here is Hoyt's intent. When Hoyt signed these returns, did he believe that the sheep were overvalued, or did he believe that the warranties were the difference in that value? And there's simply no evidence. The government submitted no evidence on that fact. If you look at the commissioner's brief, when they're citing the fraud evidence, the evidence of fraud, first they rely quite a bit or heavily on River City Ranch's number four, which can be relied on to the extent that the taxpayers did lose that case, and it was a taxpayer's burden in that case. But the burden for the government is clear and convincing, and to rely on those same facts in this case, the government has to prove that it would have met the standard of clear and convincing, and there was no attempt to do so. So all of the facts related or referencing River City Ranch's number four are no avail because there's been no proof that they meet the standard of clear and convincing. If we look next to the next documents that are cited, we find IRS memorandums. Two IRS memorandums are cited and one IRS employee who testified. The IRS employee, there was no foundation that the IRS employee had personal knowledge. He was testifying on his belief of what Hoyt would have done or did do with these returns, so that is an evidence. The IRS can't rely on those two memorandums because they're hearsay, and the hearsay objection was raised and made by petitioners in the case, and the government can't rely on its own memorandum, its own position, to prove its case. So that doesn't prove its case. Hoyt's conviction is a conviction of mail fraud, which can be over a pattern of years, and granted that pattern could come into play with tax fraud, but then there's been no specificity, no this started in 1987 and he did this in 1987, and it continued. So that is lacking. But in mail fraud, that was a case that Hoyt defrauded the investors. There were no tax fraud charges in that case, and they can rely on what happened over a period of years, and it could be action in each and every year adding up to one act of fraud. And so you have to be careful, or the government needed to be careful when it was relying on the conviction for the fraud in this case, and they made no attempt to separate out or point out once again what facts happened when and how they can rely on mail fraud to turn it into fraud on these returns. Hoyt's, there's also a question of what did Hoyt know versus what did Mr. Barnes know. And Mr. Barnes testified he thought there were, everything was fine with the sheep until the very end, and he testified that Hoyt did the business end and the money, and there were conversations back and forth. There is no testimony about Hoyt's intent. The closest we come to testimony about Hoyt's intent is Mr. Nathaniel testified about preparation of returns in 1994. However, we don't know if that's a change in practice or not, because he didn't do this. He didn't prepare the partnership returns until 1994. His testimony at points is confusing, and so at best, or at worst, it's confusing, and it doesn't meet the clear and convincing on that particular point. I understand the testimony of this tax preparer. He prepared the partner's returns without the partnership returns having been prepared. Is that right? Mr. Nathaniel, prior to 1994, prepared the partner returns but did not know what happened, what was going on with the partnership returns. He did not testify, could not testify, started to testify about that, and when questions were asked about naming the time frame, he indicated that he knew what happened 1994 and later. But the fact is that he prepared the partner's returns and put in figures that he didn't know what the partnership return would show. He was just putting in figures that were for the partners. That's not a fact. Pardon me, but actually, that's the point. That's not a fact. It's a fact in 1994 that he knew that that happened or believed that that happened. It's not a fact, and it doesn't necessarily have to be inconsistent, but we're all suspicious of Mr. Hoyt. But we don't know. There is no fact. There is no testimony about what he knew in 1987 when he was preparing the partner returns. That's the missing fact. We only have testimony about 1994 and later. I guess I'm not quite understanding your answer in that he didn't have a partnership return with a figure that would then be plugged into the partner's return. He just kind of he figured these out to the advantage of the partner. There's simply no testimony. I mean, the only testimony we have is that he prepared partner returns in those years, and that's it. So anything else is speculation on were the partner returns prepared first or later. There's been some speculation that they must be prepared, individual returns must have been prepared later due to the dates that the partnership returns were prepared. However, I can tell you that numerous partner returns were prepared in October. So the facts change in this case, and there's simply no evidence of what happened in 1987. There's evidence of what happened in 1994, but not back in 1987. One comment, just a few comments about the tax-motivated transaction interest. Yes, we do believe that Congress repealed this for a reason, that they didn't like how it was being applied and removed it. They didn't get rid of 6621C entirely. There's still a corporate interest charge. Where does that get you since they, at the same time, explicitly left the statute on the books through tax year ending, whatever it was? I've forgotten, 89, whatever it was. Only that Congress questioned the application. Left the statute on the books. You don't dispute the fact that the statute applies. Statute applies. And we argue that we don't have shams here. We don't have a factual sham here, and we don't have an economic sham here. We don't have a factual sham because we know sheep did exist. We have uncertainty about how many sheep, so partial sham, partial. We do know that the partners made payments on their notes, and this is very distinctly different from other tax shelter cases, is that this was not an economic sham, that Hoyt partners made payments. It's non-recourse, however, the notes. Recourse. They were recourse. And Hoyt wanted them paid and kept track and had collection activity and went, you know, maybe not literally knocking on the door, phone calls if they did not pay. So absolutely recourse, and that's a huge distinction in this case from numerous other tax shelter cases. And finally, we think we should be looking at the intent of all of the partners after 1987 because they're general partners. And if you look back historically, we look at the promoter and what the promoter has done because the promoter is the general partner. In this particular case after 1987, you can look at all of the general partners and the rest of the general partners were working on the ranches, were making payments, were working the rodeo, were doing real non-sham work. They believed they owned sheep. And if I could keep my remaining minutes. Sure. Yes. Here we are for River City Ranches. Essentially there are. Better state your name for the record. Sorry, Anthony Sheehan for the commissioner. Essentially there are three issues the commissioner addressed in his brief. I'll take them in turn. First was the tax-motivated interest issue. There are different factors in which if an underpayment is attributable to various different factors, this interest can apply, one of which is valuation. I think we demonstrated very well in our brief that the sheep were overvalued. I'd like to say that we talked about the share crop agreements. Those were not part of the purchase price of the sheep. They were supposedly funded separately out of a share crop agreement with Barnes Ranch, so those should not be counted in the value under the facts of this case. Secondly, these were economic shams. I don't think at this late date we can doubt at all that the Hoyt transactions were shams. Now, the partnerships, the partners here would like to argue about what they did as individuals. Well, this court remanded to analyze the partnership-level transactions. This is a partnership-level case. All we can look at are the partnership transactions, the purchase of the sheep, the validity of the indebtedness. These are the transactions we are looking here, and precedent that's all cited in our brief is quite clear. The motives of the individual partners when they joined, when they sent Hoyt checks, they are totally irrelevant to this. The only thing we're asked to decide here, the only thing we have jurisdiction to decide here, is whether the partnership-level transactions, the sheep purchase, the sheep depreciation, the interest deductions, whether those were shams. I think at this late date there can be no doubt that the Hoyt organization transactions were shams. Moreover, I would add that on that particular issue, the burden of proof is on the taxpayers, on the partnerships, I'm sorry, on the partnerships by preponderance of the evidence. The second issue is the six-year statute of limitations. I'd like to address first of all this idea of false or fraudulent items on the returns. It was conceded in the pleadings, we checked that out right before coming over here, that indeed each return contained false items. If you look at the way the pleadings worked out. Secondly, if you look at the stipulations. And remember, 6229 talks about false or fraudulent. It's in the disjunctive. Well, the stipulations said without reservation that the partnerships never got the benefits and burdens of ownership, that all the partnerships, there's no differentiating among all the various River City partnerships. They didn't get the benefits and burdens of ownership, that they're not entitled to depreciation deductions stipulated away, that there was no valid indebtedness, that they're not entitled to any interest deductions. You look at the decision documents in these cases, and each decision document contains at least a depreciation and or an interest deduction. Therefore, you go through each partnership each year, you look at the stipulation, how the partnerships can argue that we're not entitled, we didn't get the benefits and burdens of ownership of any sheep, we're not entitled to depreciation deductions, and then say the commissioner didn't show, there's no proof that there are false deductions at each return. I just don't, you know, that just doesn't work. If you stipulate it away, that's the purpose of a stipulation. That's the purpose of a stipulation, to establish the facts without the need to go through and put on proof. So we move on to probably the trickier issue of what was Hoyt's intent. Now, the partnership would like to argue that the commissioner cannot rely on River City Ranchers 4 because what they're trying to do really is take each piece of evidence and say, well, this little fact, this little piece of evidence is not clear in convincing evidence of fraud or Hoyt's intent. We throw that out. We take the next one. That alone is not clear in convincing evidence. We throw that out. In the end, we've thrown out every piece. I think that what we really have to do is look at the entire body of evidence and take each piece for what it's worth and see at the end whether it presents a clear and convincing picture. As this Court said in the Bohoric cases we quoted in our brief, a pattern over the course of conduct can be applied to its segments, and although they might try to prevail by compartmentalizing the elements and going to work on each one singly, in the end they must all be brought together. So River City Ranchers 4, which we relied heavily because it was a – this was not a case where the commissioner won by any kind of default. It was a hard-fought case, boxes and boxes of records, several days of testimony, extensive factual findings. The tax court adopted it by reference into its opinion in the instant case. And also it presents an effective picture of what was going on. Talking about the commissioner's memos, obviously you take them for what they're worth, but there was no hearsay objection, at least not on the pages cited to in the excerpts of record in the reply brief. Page 1,000 simply was the boilerplate at the beginning of the stipulation that the parties agree the exhibits are authentic but do not necessarily agree to the truth contained therein. Page 1,017 was just a listing of the exhibits and what they were. So the first time we see the word hearsay, at least as far as I could tell, it's a huge record and is in the reply brief, and that's a bit too late to raise hearsay objection. Moreover, while the partnerships do take issue with the commissioner's brief, we have to look at what factual findings do they actually dispute. Do they dispute that Hoyt was a sophisticated businessman, that he was the mastermind of the massive fraud of a massive shelter? That's one of the badges of fraud, sophistication in tax and business matters. Another badge of fraud is inadequate records. There have been extensive findings in case after case that Hoyt's records were inadequate. Now, you might say there was a large volume of records, but even after all of this discovery, even after the discovery ordered by this court in River City Vantages I, there has been no attempt made after the loss in River City IV to say, well, wait a second, we found some new records. We can now trace it through from the sheep to the partnerships down to the individuals. Consistent with a substantial understatement of tax liability. That's the whole purpose of this is the 1,000-pound tax shelter. Hoyt operated his organization by having people plug in bogus deductions. Look at Henry Nathaniel's testimony. He did prepare partnership returns in the early years through the years at issue here, and he did indeed testify that he was preparing them without any, without having the partnership information. He was just plugging in figures. Now, he didn't actually start preparing partnership returns to 94, but his testimony was clear that he was doing them without the benefit of Schedule K1s or without the partnership information coming down to him during the years when he was preparing partner returns. Now, where do I find that in the excerpt of record? I read it, and I don't have it in my head now. ER 359. His testimony would be cited in our brief. I could find the pages if you like. They told me. Okay. It starts at 359 and goes on through. So we come down to the issue of which of these facts, which of these facts which have been established in Hoyt case after Hoyt case here are actually in dispute. We look at the operation of the partnership. Again, I think I'll just pick up where I left off there. They were economic shams. They were arranged to get, to zero out the partner's tax returns, to collect 75 percent of the tax savings, not just of the refund, but of the tax savings, because when the IRS started freezing refunds in 93 for tax year 92, Hoyt had the partners, had a lot of the partners who were remaining loyal to him, make sure there was no money withheld from their paychecks so they wouldn't have that money. When the IRS froze the refunds, Hoyt's organization started experiencing substantial difficulties. So if we just look through the badges of fraud, we'll see that the picture emerges putting all these pieces together, taking each one for what it's worth, and looking at the fact that a lot of this at this point, this late date, should be undisputed. I believe we have shown, by clear and convincing evidence, that the whole purpose of the Hoyt organization by the mid-'80s, at least, was to get rich by getting these tax payments. We also argued in the alternative, and as Applee, we can do this, because we can seek affirmance in any grounds stated by the record, that Hoyt's consents to extend should be held to be valid. And in any event, we note that the same issue is being heard this very week in the Fifth Circuit in the Martinez case, which picked up on the tax court and showed some confusion. Since this court reviews judgments, not opinions, we also ask in our brief, even if we don't have to reach this issue, that the court vacate that part of the tax court's opinion. And no further questions in River City. Anything else? Okay. Thank you. Ms. Mary? Your Honor, I believe your question was whether or not we argued whether there were false items. And the answer is, in our brief, we did, based upon evidence submitted in the case, as opposed to apparently there's a concession, and I recall that that's correct, but the answer was also correct that we did argue that in our briefs, that particular point, for what it's worth. Briefs to us or to the tax court? To the tax court. Here's the hearsay issue. It was raised in the tax court. It was reserved. It's not at a late date that we're raising it now in reply. The hearsay issue on the IRS memorandums and those documents was reserved in the tax court, and so those documents were not used. A cite for that? I can give you a cite. I don't have a cite with me right now. I can give you a cite almost immediately after the hearing, Your Honor. I have something with me. I must be losing something here. I mean, there was no hearsay objection pursued in the tax court. Yes, there was. There was? We reserved it. I remember this being argued in the briefs, actually. I'm sure maybe it was. But you made a hearsay objection. It was overruled. No, in the stipulation. In the stipulation itself. You reserved in the stipulation the ability to do things in the future. But my question is, did you ever actually make, stand up and say to the judge, I object to this memo or anything else on the ground that it's inadmissible hearsay? I can tell you that we believed that the hearsay was reserved for all purposes based on the stipulation. I'm not questioning what you thought or believed. I'm asking just simply, was there an objection made in the tax court on the grounds of hearsay to the admissibility or consideration of anything? As if it's not. We can't rule on a hearsay objection. It's just gone. These documents were submitted in a stipulation of facts. Many of the documents were discussed by a witness, but the evidentiary objections were in the stipulation itself. Numerous documents, including, I believe, these documents. Were the documents admitted in the stipulation? Yes. Okay. At the time of, at any time before they were moved into evidence, as Judge Reimer asked, was the hearsay objection raised and ruled on? I do not believe so, Your Honor. Okay. So they were received in evidence. Doesn't that negate them any current objection to hearsay? It was, I can tell you that the paragraphs in the stipulation were intended to reserve hearsay objection for all purposes. But they got implicitly overruled because they were admitted into evidence. We have other stipulations that don't have that, and so this particular stipulation is actually different in that particular way. Perhaps it was ineffective, but it was intended to do so, Your Honor. Okay. File 101 is that when they get moved into evidence, once they're in, they're in. Unless they're limited. I see my time's up. As I said, this was a, the paragraph was actually different in this stipulation just for that purpose. Oh, okay. We've just bought the ranch. Now we're moving on, huh? You okay to continue? Sure. All right. Then we'll move on.
judges: Fletcher, Rymer, Fisher